Good morning, Your Honor. Carrick Adlai for, you know, I'll give you ten minutes. Okay. I'll do my best. All right. Despite the complicated history, Your Honor, I think there's one question that permeates this case. What's that? What was he thinking? And that applies to all the issues involved. What was he thinking? What was Gugliotta thinking when he was out with Hearns that night? That's what the preliminary hearing magistrate, the predecessor defense counsel, and even the prosecutor agreed would be the central question for Gugliotta's liability. And although that was the central question, Gugliotta's trial counsel never presented and undisputed evidence shows, never investigated any evidence. Gugliotta suffered severe mental deficits that had been present since birth. Deficits Gugliotta's predecessor attorney began investigating. Deficits that affected Gugliotta's ability to understand and interpret the actions of other people. A person with an IQ of only 73, clearly well within the range of intellectual disability, what we used to call mental retardation. Gugliotta had the mental functioning of a child. What was he thinking? And that same question applies to trial counsel. Why didn't trial counsel present evidence of Gugliotta's clear mental deficits? Did he not know? Was he ignorant because he failed to investigate? And that's what the petition alleges and what the court must accept as true at this stage. At bottom, the question isn't that the evidence wasn't presented, but that it wasn't even investigated. Well, we had Dr. Osborne's mental health exam, but that didn't come in until the, until after, well, it came in on a motion after it went up on appeal and back.  Absolutely. I'm confused as to whether or not this question, the failure to investigate the mental capacity and to put on evidence of that as ineffective assistance of counsel, was ever presented to the State court. Well, it was presented to the State trial judge as an ineffective assistance of counsel claim. State trial judge in a habeas petition, or was that on the resentencing? During resentencing, it was presented to the trial judge in two alternative procedural vehicles. One was presented as just straight in the context of the new trial motion. The basis of the new trial motion was ineffective assistance of counsel. The supplemental, the supplemental argument was ineffective assistance of counsel. And the trial judge said, no, I can't consider that in a new trial motion. And the trial attorney said, then treat it as a habeas. You have the authority to treat it as a habeas. And so you should consider this ineffective assistance of trial counsel in failing to investigate in the context, under your habeas jurisdiction. And the trial judge refused to consider that issue on the merits, which is. But then did he raise it to anybody else? Because in California. He raised it in the court of appeal. And what did the court of appeal say? The court of appeal had a summary denial. And so that, our view is that the trial judge did not adjudicate it on the merits. Are you talking about Hassey Myers? That's the lawyer. The lawyer. Yeah. The lawyer presented. The lawyer at trial passed away by then. By then he had. That's correct. That's correct. And he was thought of as a very outstanding lawyer. Even the best people can make mistakes. I know. I just. I mean, isn't it possible that the lawyer strategically, for whatever reason. Uh-huh. I mean, this is obviously this horrible case law that we have on Richter v. Harrington. We have to, even though it's a summary denial, we have to conjure up justification for the court of appeal's decision. And if I conjure creatively, I would come up with, didn't he, isn't it possible this lawyer decided not to go forward with a mental defense, a mental, some kind of mental incompetence defense because it didn't rise to the level of insanity because the jury wouldn't buy it given the horrendous circumstances of the crime, and rather to go along with that she was a willing, she wasn't a victim, she was a willing participant in securing the drugs they secured that night. So under, I'll address Richter, but under that scenario, you can't make that decision. And the case law on this is clear. You can't make that decision until. If you don't investigate. Right. How do we know he didn't investigate? We'll be able to present. I think we'll be able to present evidence of that. We have the trial counsel's investigator is still alive. I've spoken with him. It wasn't investigated. The family is still around. They're available. They can say we didn't talk, we weren't asked about these questions. And the co-defendant's counsel, Dale Rubin, is still a member of the district court, very regular, active lawyer. He's still available. And predecessor counsel I'm sure you're well aware of as well. That was John Takasugi. He's still around. There is abundant evidence from which we can show that, in fact, the investigation wasn't done. And even without the trial lawyer, the existence or nonexistence of a strategic justification is a factual question. Without presenting the evidence, without investigating the evidence, he can't have made that decision because he doesn't know how horrendous the mental evidence would end up being that might, in fact, counterbalance it. I'd like to briefly address Richter because there's a number of factors about Richter. But, look, you know, this is the second time we've had this case before us. I don't believe so, Your Honor. I'm sure we did. I don't believe so. We never had this case before? No, it was a long time in the district court. I mean, you're telling me we never had Gugliotto's case before this panel before? I don't believe so. Well, sure we did. Well, if we're back here again, I think we better look at the file yourself. Only for the certificate of appealability. I don't think so. Oh, yeah. Okay. We've had this case for a long time. Well, so tell me how you would distinguish. So, in Richter, the issue was a failure to look into a forensic question. And, critically, that forensic question was not an issue until trial. Here, aiding and abetting, facilitating, encouraging, that was being challenged at the outset of the case. In Richter, there was a substantial risk that the investigation would lead to a dead end because the forensic testimony, the forensic issue tied to the defendant's story in Richter, which had some weaknesses and the Supreme Court was very dubious as to its credibility. Here, there was no serious risk of a dead end. Predecessor counsel had already gotten initial records that revealed extended neonatal hospitalization. It was a lifelong history of special education, which later revealed skull fractures, suicide attempts. These weren't just tantalizing suspicions, but abundant evidence of mental health problems. Richter, not only was there a risk of a dead end, so just a waste of time, but the investigation itself could be potentially harmful, because the evidence that wasn't tested was in the prosecution's custody. So defense testing carried the risk that it would notify the prosecution, here's where we're going, and prompt prosecution testing, which would further, could further undermine Richter's story. These facts were solely in the defense sphere. It was friends, family members, a client, institutional records, medical records, school records. All of this could be done without tipping off the prosecution. And in Richter, there was an obvious strategic decision. The idea of litigating forensic science details versus a case where they could, that would risk clouding over. The prosecution's key witness in that case was a drug dealer. That was their only case. And one theory was push that case as just an attack on the drug dealer's credibility. Going into scientific evidence could risk clouding over that issue. Here, there was no strategic compromise. Codefendant Hearns was going to trial together, and he was already challenging the witness. He was challenging the underlying episodes. The trial of fact could not overlook these questions about what happened that day or that night because they had to adjudicate what Hearns did or didn't do. And if Hearns was found not guilty, Gugliotta didn't aid and abet any crime. So there was, and furthermore, unlike in Richter, there was no conflict between the mental health theory and the prosecution's case because the prosecution's own witness here collaborated the mental health defense. She said, I didn't even know if he was alert. He was in his home world the whole time. That's totally consistent with mental retardation or mental health deficits, extreme amount of intoxication. The mental health would have explained the prosecution case without even contradicting it. So there was no sort of problem that was present as in Richter. And one other factor about Richter, the Supreme Court made very clear that the defense lawyer in Richter was very aggressive. He asked probing cross-examination. They characterized the overall performance as capable and effective. He called seven witnesses, including Richter himself. In this case, Gugliotta's trial attorney did not call any witnesses. There were some defense witnesses. They were all called by Hearns. The defense lawyer, the trial lawyer, sorry, ignored concessions and stipulations that his predecessor counsel had gotten out. And I think the record here shows nothing more than just riding Hearns' coattails. So you're asking for an evidentiary hearing to find out exactly why all this was going on? Your Honor, we think if the evidence is undisputed, we think that this Court can grant relief in the first instance at this stage. But if not, absolutely. These facts cry out for an evidentiary hearing. What happened? Why was he thinking? What was he thinking? What was trial counsel thinking? What was Gugliotta thinking? What was the evidence that could have been presented? And this is all that the defense had to do, was raise a reasonable doubt that Gugliotta knew the full extent of Hearns' crimes. Because in this case, none of the crimes occurred in Gugliotta's presence. None of the crimes were discussed in Gugliotta's presence. He didn't propose them. He didn't negotiate them. He didn't suggest the crimes. He was quiet and complacent in his own little world. He didn't say anything to Hearns or Maria indicating he knew about, let alone understood, what was happening to Maria outside of Gugliotta's presence. The only thing the prosecution relied on were ambiguous acts that were entirely passive and leave open the question, what was he thinking? And even the prosecutor herself conceded that the proof of Gugliotta's aiding and abetting was thin. I would like to ---- You're correct. This is the first time this matter has been before us. Thank you, Your Honor. If I could just give a quick ---- unless the panel has other questions, I'd give a quick summary that ---- Go ahead. I mean, the State is trying to impose criminal liability. And because of Hearns' sex crimes, they're imposing lifetime sex registration on Gugliotta, on an intellectually disabled individual who did no more than behave like a submissively obedient 4-year-old child. The question isn't whether those acts facilitated Hearns, but whether Gugliotta knew and understood Hearns' broader objectives and specifically intended to advance them. He was told to hold an object, and he did. Now, the State adds he was told to get into a car, and he did. And the State is right. Those acts do not require much sophistication at all. And whether or not sufficient to sustain an aiding and abetting conviction under the very permissive Jackson standard, it was far from overwhelming evidence that Gugliotta knew what was going back on. As the prosecutor said, it was thin. In the face of such innocuous and ambiguous acts, upon learning Gugliotta was mentally retarded, severely disabled, which, you know, the Supreme Court has talked about, people unable to make calculated judgments, the diminished ability to process information, the fire in fact could have had reasonable doubts as to whether those simple acts Gugliotta realized, beyond a reasonable doubt, the full extent of Hearns' criminal purpose, that his innocuous actions were facilitating those crimes, and that he did so because he intended and desired to facilitate those crimes. The prosecution's case was weak. The overlooked defense evidence was strong to the extent the facts aren't disputed. I do believe that the Court could grant habeas relief, but I don't doubt that the record would be better set up with an evidentiary hearing as well. Now, refresh my memory. Did you – who represented your client when the matter was before the magistrate's hearing? That was an attorney, Kiana Sloan-Hillier. Kiana Sloan-Hillier. Correct. And when did you come into this matter? On appeal at the Ninth Circuit here. On appeal. After a certificate of appealability was granted. All right. Thanks. Thank you, Your Honor. Let me just ask one other question. And so what relief are you asking for? We're asking for a reversal of the district court's judgment. The remedy could either be reversal with directions to grant relief, habeas relief, or at a minimum, reversal with instructions to hold an evidentiary hearing on the ineffective assistance of counsel claims. That's basically what you want, a hearing on the ineffective assistance of counsel claims. That's correct. And I would point out that there's – it's combined as both – I mean, all of the mental deficits really permeate the record. What's the standard for giving a – allowing an evidentiary hearing? It's that there's a prima facie claim for relief, which I believe there is in this case, and that the facts have not yet been reliably found by a prior court. There's been no evidentiary hearing. The facts – Earp, Earp V. Ornosky, I think 431F3rd comes to mind, and there's another name that I'd have to get my notes. The name is in 6th and Meyer, but to spell it out, I wouldn't be able to do by memory. What does it say about the opportunity to develop the facts in the State court? Your Honor, if the – if the Petitioner failed it to develop, which – by which the court means failed to take the opportunity to develop when it offered the opportunity, then there's no hearing. But here, Petitioner tried to – he presented – he presented – And the court said it didn't have jurisdiction. Correct. They just pushed it off. And then the Court of Appeal in California Supreme Court did summary denials. You look through to the underlying – the original presentation. The underlying presentation was not an adjudication on the merits. So although this case was – the claim was exhausted because it's been presented to all the courts, actually it was never adjudicated on the merits. And it's not through – I guess I would say it's not through Gugliotta's fault that the claims weren't adjudicated. He did whatever he – There never was a hearing on the merits. That is correct, Your Honor. The magistrate judge didn't hold them. That is – that is correct. The magistrate judge did it all on the basis of the documents. That is correct. That is correct. All right. And the magistrate judge did have a copy of the psychiatrist's report, Dr. Osborne's case. That was in the record. And the magistrate judge had before it Gugliotta's history. I'm not – I'm not sure. About his neonatal care, his grades in school. She had – She had something. She had that through Dr. Osborne's report. She didn't have the underlying records. And she did not have testimony from other people. She had the predecessor lawyer's declaration saying that he did, in fact, start doing a mental health investigation. I would just – to respond to Judge Wardlaw's sort of, you know, how do we speculate? Predecessor counsel was thoroughly familiar with it and didn't think that it wasn't worth an investigation. There's a lot of negatives there. But the short is, yes, Hearns did a lot of terrible things, but Gugliotta didn't do anything. And predecessor counsel thought there was enough there. Should at least look into the mental health issue. And the public defender, John Takasugi. Yes. Was he Judge Takasugi's?  Yes. He had that case. He did. But he was conflicted out. After – For a reason. After that – He started preparing for a mental health defense. He did. And he gave this information to Stillman. To Silliam, the new lawyer. Silliam. Floyd Silliam, yeah. Yeah. And Silliam conducted a nine-day bench trial before Judge Collins. Yep. And the comment has been made by the California courts that basically presented – he presented no defense. That – I think that's true. He wrote Hearns' coattails. And I was just going to say, if you look at Silliam's closing argument in this case, the State gave it to you in the supplemental excerpts. It's at pages 11 and 12 of the supplemental excerpts. That's two pages. And if you look at it, the text is only one page. Basically, he says – I have that. Yeah. He says – I have that. What Hearns said. Yeah. So he had the opportunity to have somebody else completely litigate one issue, to present his own issue. And he could make the decision later. Perhaps there's not enough. But with mental retardation and the lifelong history of special education, it's highly improbable that a reasonably competent lawyer wouldn't have done so. And the California Court of Appeal reversed on – as to Ugliotto on the five rape counts. There were a lot of counts here, because they did reverse on some of the counts. I apologize for not knowing exactly which ones. Five rape counts. He still ended up being convicted. Yeah, I know. I'm just saying that. I think it was five out of nine or eight or something. Every time Hearns did something – I believe they reversed on all the rape counts. I'm not sure that it was all, but I'll look into that. No. No. It was. Not infallible either. I know he ended up certainly with a kidnapping and a robbery, aiding and abetting a kidnapping, aiding and abetting a robbery. And I believe there was something else. Yeah. And the murders. Yeah. And I know he ended up with a sex registration. So I'm just assuming that there were still the sexual offenses that were still involved. I guess he was aiding and abetting Hearns' rape when he was told. Well, Hearns' five counts were reversed as well. Right. It was a question of timing when the injuries to Maria occurred. I think those were the ones that – I broke it down into several episodes, because there were like five or six or seven episodes. And I think it was the middle episode where they went behind – where Hearns took Maria, they went behind the apartment, and he enlisted several other people to commit sexual acts on Maria. And I think it was in those cases that the court of appeals said that there was no finding – there was no evidence to support that it was in concert, which wasn't quite the issue I was dealing with, because Gugliotta at this point, he was sitting in the car, he was just all by himself in the car, and he had no idea what was going on behind the house. Certainly, there was no evidence that anyone told him what would go on over the fence and behind it. That was by the railroad tracks, I think. I think that was in – I think it was the greenhouse apartments. Yeah. Okay. So all right. Thank you. Thank you, Your Honor. Sorry to keep you waiting over there. No problem, Your Honor. May it please the Court, Carl Henry representing the warden. This case is controlled by Richter. I'll get back to Your Honor on that. I assume everything is fine and dandy, notwithstanding the fires and so forth. Which warden is it? It's Sylvia Garcia. I know, but jail. That I don't recall. And, Your Honor, I apologize. That said, this case is controlled by Richter, and Richter compels affirmance. Double deference compels affirmance because the California Court of Appeals' denial was not wrong beyond any possibility. A fair-minded disagreement under Richter. And there is a reasonable argument supporting the California Court of Appeals' denial. Let me try and flesh out some of the procedural points that I've heard, because I want to make it as clear as I can. Over 12 years ago, in 2002, Dr. Osborne's six-page opinion letter was presented to the state courts. Specifically to the California Court of Appeals. I'm getting to the point that we do have a merits determination for purposes of the Richter presumption. Specifically, it is true that after trial counsel passed, rest in peace, April 1999, to be specific. About a year after. Yes. He was 57 and died of natural causes. Myers, Counsel Myers, had a case from that standpoint on resentencing vis-a-vis the mandate from the California Court of Appeals. As to the first direct appeal. At that time, Counsel Myers offered a motion for new trial. And attached to that motion, Dr. Osborne's opinion as well as her own declaration. Indicating that she had spoken to the father and so forth. Who incidentally appeared at the resentencing hearing along with Petitioner's brother. And the judge, to fast forward, gave them both an opportunity to speak on behalf. And they did not do so. That said, with that canvas in mind. Well, that happened in January 2001. That was in 1999. I think it was. Yeah, the Wynand proceeding. That is correct. It was a motion for new trial. Right. She made that at the resentencing. Right. Okay. And so what did the Court do then? The Court, as Counsel Fairley stated and as fully briefed. The Court found that it did not have jurisdiction to rule on that issue. Because its mandate was pretty clear as to the first appeal. It was there to resentence given the striking of the counts that have been discussed. The in concert counts, specifically. It is also true that Ms. Myers asked the Court in the alternative. To view this as a habeas case. The Court said I don't have jurisdiction to rule. But let's look at what subsequently occurred. Can I ask you something? Yes. Was the Court right in that? We believe that was correct. But it was curable and it was cured. If there was a jurisdictional defect, it was cured by a freestanding IAC claim that was raised in the California Court of Appeal. Concurrently by Counsel, I believe it's William Hayman. As to the second appeal. The California Court of Appeal said we're going to consider the habeas petition concurrently with the second appeal. So any jurisdictional issues that occurred as to the motion for new trial with the trial court. With the superior court. That issue was cured by the freestanding ineffective assistance of counts. The second appeal, is that the summary denial? It's not just the summary denial, Your Honor. For example, on the direct appeal. What date was it we talked about? That was the 2002 opinion from the California Court of Appeal, which would be the second appellate opinion. Okay. August. Where is that in the record? I'm sure it's in supplemental. What date are you talking about? The California Court of Appeal's second decision was in 2002. I don't have the specific date in front of me, and I do apologize for that. So I have it in front of me, and this is what it says. It says the petition for writ of habeas corpus filed June 14, 2002, has been read and considered concurrently with, but separately from, the appeal in people v. Gugliotta number, whatever. Right. The petition is denied. That's all it says. However, if the court were to look at the tandem, the companion, direct appeal opinion, it talks about Dr. Osborne's letter. What is that? The habeas petition itself is in the supplemental excerpts of record 129 through 64. The opinion from the California Court of Appeal, I'm going to give a string of sites. I will say supplemental excerpts of record 129. I will look at volume one, excerpts of record 61, volume three of the excerpts of record 361 through 62, and I have a C. And I'm looking at the answer brief at page 12, which has all the sites as well as the California Court of Appeals. Does the California Court of Appeal decision discuss Dr. Osborne's report? Supplemental reporter's transcript, supplemental excerpt of record, excuse me, 98 through 123. And specifically, what petitioner raised on direct appeal was the claim that his remanded sentence of 39 years to life was cruel and unusual punishment under California law. That required an analysis of the nature of the offense and the nature of the offender to determine whether or not there was an Eighth Amendment violation. In the context of talking about the nature of the offense and the nature of the offender, the California Court of Appeal in its written opinion discussed Dr. Osborne's letter and referred to it in essence as being filled with speculations and so forth. And again, as Your Honor just read, the summary of the denial was being ruled concurrently with the written opinion. We know from the written opinion's discussion of Dr. Osborne's letter that the California Court of Appeal discussed and was concerned and took into consideration the main evidence before the state court, and that was Dr. Osborne's opinion. Was it, I don't, was it considering this precise claim in effective assistance of counsel for failure to investigate and present evidence of mental incapacity? It was if the court fairly reads the court's language. The court said it considered a habeas petition concurrently with the second appeal. We have a summary denial, which is fine under Richter. That's Richter. And this case is controlled to that extent. But beyond a summary denial, we have the California Court of Appeal in the same posture in its concurrent direct appellate opinion discussing Dr. Osborne's letter, showing that it read the letter and it considered it written-wise with respect to the nature of the offense, nature of the offender in the context of an Eighth Amendment claim. But that discussion went along with the court's summary denial. So we know that the court did not do a jurisdictional point as to the IAC claim. The court issued a merits decision. It was summary, which is perfectly fine under Richter. And beyond Richter, we have the California Court of Appeal discussing Dr. Osborne's letter for purposes of the Eighth Amendment claim. So we've got summary denial plus we would submit. And I think as my time — But there was never a hearing on the aspect of assistance for the Eighth Amendment claim. That is — That's not a hearing. Under California law, he was required, and I think footnote 12 of Penholster makes the point, that if the state court issues a summary denial, it's the state court's finding that he did not make a prima facie case. And that's perfectly fine. That, again, places us in a Richter type of context. And I kind of want to emphasize the point that we have a trial record. Well, what was the point in putting in Dr. — the doctor's report, Osborne's report? The point was to put his best possible evidence to try to make a prima facie case, and he failed. A prima facie case on what? Of ineffective assistance of counsel. It's our contention as we briefed. Is that clear that — was it clear to counsel that the court was considering — this is an appellate court — was considering the issue of ineffective assistance of counsel? Yeah, because that's the only claim that was raised in the habeas companion habeas. It was just standing on its own, freestanding. Ineffective assistance of counsel based on the evidence, and specifically Dr. Osborne's letter. And it must be pointed out in — Freestanding. Freestanding. He had a habeas petition, and he had a direct appeal petition. In the habeas petition, nothing else concerned itself other than the ineffective assistance of counsel claim. The exhibits were the same exhibits that were proffered to the district court. The same exhibits that are proffered here. The point of it being is 12 years ago — But there was never a hearing. How are you going to decide ineffective assistance of counsel if you don't have a hearing? Because it's Respondent's position that as Strickland dictates, petitioner bears a heavy burden of rebutting the strong presumption of competent counsel. And in this particular record, as I would point out, among other things, the 1997 trial record shows that after his bar appointment in April — And which counsel are you talking about? I'm talking about the deceased counsel. Yeah. After his — The California Court of Appeals, as I recall, made the statement that he put on no defense. Well, I'm saying that the court of appeal considered the trial record along with the habeas record. Isn't that the same court that said he put on no defense? He put on no defense, but as was pointed out — The same court that said that. Yes, but that may have been and probably was, and we would submit presumably under Strickland, that was a tactical decision. Significantly in the record, the trial record in 1997, the trial record shows after his appointment — After trial counsel's appointment in April, after he waived jury trial in July, he was granted a continuance in September to, quote, further investigate the evidence. Who is he? Trial counsel. Name him. Silliman. Silliman. Yes. And the witness testified roughly seven weeks later. The point being, that plus the fact that petitioner to date, even now, is asking for a fishing expedition. He has not proffered any facts showing non-investigation. Strickland dictates that there's a strong presumption that counsel's decisions came within a wide range. And for example, if there's some investigator that's out there, that's new to anybody listening to this case. It's not in the briefs. It wasn't presented 12 years earlier to the court. Wait a second. Now, what investigation did Silliman make during the trial? Your Honor — As far as the mental health issue is concerned. Your Honor — What investigation did he make? Your Honor, respectfully, that's the attorney client privilege. It's not our burden to show what he did. It's their burden to make that prima facie case. They haven't presented anything to the state courts or to the federal habeas court by way of a declaration from petitioner, from the investigator who apparently is still alive, from Dale Rubin who apparently is still alive. Again, 12 years ago, they had an opportunity to present — They did not put that in before the district court. And they didn't put it in in 22 in the habeas petition to the California Court of Appeal. They had their chance 12 years ago to do all of this. They tried to meet their burden, and they couldn't rebut the strong presumption of competent investigations. We don't know whether or not — And here's the point of Richter. Fair-minded disagreement can exist as to whether there was an investigation or not. But that's the presumption. He needs to rebut it, and he has not done so. And he's certainly not entitled to 12 years later, after having presented all of this in a pinholster sort of way to the California courts, to go back 12 years later and say now it's the tip of the iceberg, as I think he puts it, and says we need to dig even deeper 12 years after having presented Dr. Osborne's letter to the California courts in 2002. And I really want to get into Dr. Osborne's letter at least quickly any time that I have remaining. Well, it was when it came to the district court. Were these same objections raised by the State? Well, you never — two quick points. The petitioner, more importantly, never questioned whether or not this was an AEDPA case. Even in the objections to the report and recommendation, counsel never claimed that this was a de novo case. Counsel has always proceeded on the proposition that you had a merits ruling, and the applicable merits ruling was the California Court of Appeals decision in 2002. We've discussed in footnote six of the answer brief that this theory of no merits decision, this theory of de novo review is a new theory that has been forfeited, period. So we did not make any objections because everyone up until today or the opening brief in this court has made the correct assumption that the California Court of Appeals decision was the applicable merits decision for purposes of Richter. That is what this case has always been about, and whether or not there can be fair-minded disagreement as to that summary denial, period. That is what brought us here. It has changed because of the advocacy of counsel in terms of these new theories and forfeitures and so forth, but that fairly is what has occurred in this case. It's a Richter case. It's controlled by Richter. Yes, Your Honor. Counsel, what were the mental health defenses available to counsel at the time of this trial? I think that would be a fairer question to Petitioner's counsel than myself, but let's just look at Dr. Osborne's. I'm trying to see, I'm trying to imagine what the California Court of Appeals could have. For example, utilizing Dr. Osborne's report, Petitioner denied to Dr. Osborne, and I'm just going chapter and verse from the report in no particular order. Petitioner denied to Dr. Osborne, quote, any prior history of conviction. Counsel would presumably know that was a lie and that a mental defense could expose a finder of fact to prove that Petitioner had, in fact, pled guilty to not just an offense, an offense involving specific intent, that it occurred shortly before the charged crimes in this case and more. What crime is that? I'm sorry? What crime is that? He and hers, in 1995, had pled guilty to making terrorist threats in the same general housing project where the victim was initially abducted. Was that admitted in the trial? Was that part of the trial? Well, it didn't come in the trial because Petitioner didn't testify, but had he put on a mental health defense, which under California law would presumably have come in under California evidence code section 1102. Consequently, under evidence code 1101, the prosecution would have been allowed vigorous but fair cross-examination. You're saying that in order to put on a mental health, mental incompetency defense at that time in California, he would have had to testify? No, not at all. He could have had an expert come and testify as to his state of mind, but that expert's opinions would have been tested. Okay. Rightfully so. With the conviction, the conviction would have come in. Among other things. For example, he told Dr. Osborne, quote, I never smoked cocaine. We know, and trial counsel presumably would have known that was a lie because of the statements by the victim to the police and the victim's statements at trial. I could go on and on and on. If he had put on a mental health defense, he, Petitioner, told Dr. Osborne. Let me just ask you, what is the explanation for, if any, for why putting on no defense at all isn't an effective assistance of counsel? The explanation, as I've tried to diplomatically state and perhaps too laboriously, is that this was a strategic tactic. In my mind, the case is fairly viewed as follows. The initial preliminary hearing counsel between apparently January and April of 1997 had begun a possible mental health investigation. His files were then turned over to trial counsel Silliman. Counsel Silliman took over precisely April 9th. You're talking about the public defender Takasugi. Yes. He turned his files over on April 9th, 1997 to trial counsel. Trial counsel then had the case start to finish from April 97 all the way up to sentencing June 1998. And the relevant dates that I would highlight are the fact that he took the case in April. He waived jury trial in July. He asked and received a continuous to do further investigation. And I'm referring to the clerk's transcript, page 382, to verify that fact. And seven weeks later, Maria, the victim, testified. Petitioner has not shown that either, A, there was no investigation. Why don't you hold your voice up? Okay. He has not shown either, A, there was no investigation, or, B, counsel made an investigation and strategically showed or came to the conclusion that's enough because if, for example, I try to show intoxication, according to Dr. Osborne's report, my guy has been smoking marijuana since 14 and 15. He's tried everything from heroin and PCP and everything else under the sun. The expert purportedly or petitioner himself would be subject to vigorous cross-examination at that point. Perhaps the prosecution would even bring on its own expert to show he had developed some level of tolerance because bear in mind, we have a 19-year-old victim here who, despite untold numbers of forced smoking, was still lucid enough to try to remember all of the events that occurred. So if a first-time user could remember these events, surely someone who had been using cocaine, heroin, PCP, marijuana all the way back to 14, and he was 21 at the time of the crimes, can't hide behind the intoxication because under California law, as counsel didn't quite state, petitioner's counsel would have had to show two things. Number one, there was a sufficient impairment, and two, that specific impairment actually prevented him from forming specific intent. He would have had to show two of those points. There's another problem here that Silliman, all of his files have been destroyed. Your Honor, life happens. Witnesses die. Judges die. Memories fade. Thank you. Why don't you strike that last statement? It's an important point, but the point is... The attorneys will go on forever. Well, this case, to the contrary, because it's too easy and too convenient to say I'm here because of my deceased lawyer. It happens. That is one of the driving forces, it would seem, by not just presumption under Strickland's first prong, a strong presumption. Things happen. Things happen. And more importantly, it's interesting that counsel would say the investigator is still alive in 2014 because, again, that's a perfect illustration of what could have been offered to the state courts in a penalty. Counsel, do you have a copy of Silliman's argument, opposing argument? I put it in the supplemental excerpt, Your Honor, and I don't have that in front of me, but counsel is correct. I put it in there, and it's a very short argument, but the argument itself makes... I want you to read it to us. I don't have it in front of me, Your Honor. But I remember the argument, and I can tell you the genesis of the argument and why... You know, you've got to kind of read it. It's okay. Do you have a copy of it? I'm just trying to divert you a little bit. Okay. Why don't you give it to him and let him read it. Thank you. Don't forget he was a sick man, and he wasn't yelling. Well, I don't think that's a claim in this case that that was part of the issue. I've read the argument. I can read it again if you like. I don't see any reason to belabor the point. The one thing I am going to jump to, though, is Mr. Rubin, co-counsel for Hearns, who did testify, was talking about how the issue of clothes is an important discrepancy. I remember, and I remember you looking at me when I asked her. He then continues. I don't know if he wants me to continue this, but the fact is is that that argument in this bench trial... Because I can see somebody, particularly after being traumatized by an awful night, if it happened, throwing her clothes in with the others, washing them, and not even knowing that she did it. I can't see her carefully washing, hand-washing a sweater and forgetting that fact. And that's why I think that issue, that issue of clothes, is an important discrepancy to continue. But basically, the problem that you have, I think, with Maria R. is that between the drugs that she allegedly ingested, between, add to that the sand mark evidence that indicates that she initially said happened, could not have happened, and you add that, the emotional trauma, if what she says took place caused her to, in fact, go to the police and describe two acts of forced sexual intercourse with my client that could not and did not happen, then all of her testimony becomes suspect. And her testimony. And this is crucial with regard to whether or not, in fact, Mr. Hearns handed a knife to my client, and he held it and handed it back at a later time. That is suspect and sufficiently suspect that I don't think you can convict him at all. That argument, in the totality of the circumstances, was perfectly reasonable for several quick fronts. Remember? But as it turned out, the Court of Appeals reversed on those rape counts. Not all of them. The forced in concert counts, the counts that occurred around the building at the apartment. The rape of Hearns in the car? Rock hard. No pun intended. Yes. What did she say? What did she say? That argument touches and concerns her backpedaling with police pretrial as to whether Petitioner, in fact, was a rapist. And that, in light of Hearns' testimony and Hearns' counsel's argument, makes that argument sensible and reasonable. The point of it being. And the DA stipulated at the preliminary hearing, and incidentally, these comments about the evidence being thin, those comments were made by the prosecutor at the preliminary hearing, period. The prosecutor didn't say that months later at trial. The evidence at the preliminary hearing was enough to get it past the probable cause stage. And, in fact, that evidence wasn't made to the same judge. Judge Collins, in essence, was not the preliminary hearing judge. You know, it doesn't take much to get through a program. Well, not only that, Your Honor. The reason why it was thin, perhaps, is that the victim didn't testify at the preliminary hearing. The preliminary hearing evidence was predicated on what the officers had heard the victim say. We had officers testifying at the preliminary hearing. Going back to that argument, the victim. That's what they put on a minimum of information. Correct, Your Honor. Well, I've sat through lots of preliminary hearings. Correct, Your Honor. The prosecutor's, the trial counsel's argument that the court had me read, is in the context of coming out of that mushroom cloud, so to speak. The victim initially reported to the police that besides her, he was raping her. Besides the breed, Daniel was raping her. Petitioner himself raped her. And then she started having nightmares as to whether or not that actually occurred. So she subsequently told the police, having first told them that Petitioner raped me. She then went back and said, no, Petitioner didn't rape me. So trial counsel's argument throughout the proceedings seems to have been twofold, in my mind's eye, reasonable. Predicated on the fact that how can you believe this particular victim when she reported one thing as to my client and then recanted that. It calls into question the entirety of what she could remember. Plus the fact she was strung out on drugs. She's just not credible. However, she testified at trial, unlike at the preliminary hearing. And at trial, the judge, as trial in fact, heard two versions 365 degrees apart, 360 degrees apart from each other. Hearns testified, and no doubt, presumably, between point A and point B. Trial counsel for Petitioner and trial counsel from Hearns huddled up in this joint trial before a trial fact judge and said, what's going on in terms of your strategy and tactics? The point of it is Hearns took the stand and gave a completely. Well, no, I'm saying Hearns took the stand and said the exact opposite. I'm sorry I asked you to read that. Hearns, fair enough, Hearns took the stand and not only made trial counsel's argument point, Hearns took the stand and said point by point, we didn't stop. She stopped at the stop sign, but she invited us to the car. She asked us to get the drugs. She wanted to F-U-C-K into our game. She wanted more drugs. There was no robbery. There was no this. There was no that. You can S-T-O-P now. Okay. Thank you. Dan, I would like to briefly respond to a couple of the items that were said. Thank you. Maybe I'll start with the last thing, which was about possible alleged sexual contact between my client and the victim here. There's no evidence of sexual contact between Maria and Gugliotta. Maria said she did not know and did not believe there was sexual contact, but it was possible. She used it could have happened. And then she clarified, no, it did not happen. I've been reliving this over and over again. It did not happen. There is a stipulation, though. And there is a stipulation that it did not happen. There is a stipulation that for all purposes, and I think that would include for purposes of whatever it would include for habeas, it would conclude for purposes of trial. And when this Court addresses what the evidence would have looked at at trial, it would include that stipulation, that this wouldn't be impeaching it. So I'll leave the stipulation. I would just address a couple things about Richter. I gave a bunch of reasons why Richter is a completely different type of IAC claim. But I'd like to remind the Court that Richter doesn't even apply about speculating reasons unless 2254d, unless this claim was adjudicated on the merits. Richter is an application of the speculation and unreasonable and we hypothesize when we have to go through 2254d, which only is required when you adjudicate something on the merits. What the court of the — I'll just respond to what counsel talked about. The court of appeal did a brand new thing. The Supreme Court told us in Yilst, or Yilst v. Nonemaker, that you'll look through what the court of appeal did. I really can't because the superior court didn't give a reasoned decision. Well, what we look through to, though, is that it was rejected on jurisdictional grounds. The trial court was presented with a habeas petition. It was a written, entitled motion for new trial. Then it was asked to be considered in the habeas jurisdiction, in the habeas context, and I think, Judge Wardlaw, your question was right on point. The trial judge was wrong about jurisdiction. The trial judge should have considered the habeas petition, but didn't. But what the court of appeal did consider in the appeal, not in the habeas, was a very different issue. And that was whether — whether the trial court imposed a cruel and unusual sentence under the circumstances. And that required the court of appeal to say, was the sentence erroneous? Did the trial judge err as a matter of law, and was Gugliotta entitled to a more lenient sentence? Strickland? Those are not Strickland questions. Those are very different questions. But in the habeas petition presented, was it the IAC based on failure to present a mental competency defense? And failure to investigate. So that was before the court of appeal. That was before the court of appeal. But Rick, I'd say, Ilst wrote a rose in the area of procedural default and bar, and So it's exactly the same. I don't think that's what the Supreme Court was doing. Okay. The court of appeals. I don't think it was — because it didn't say we didn't have jurisdiction. I can't say. I will say that what the court of appeal discussed in its appellate opinion was a very different situation. And when it addressed, to the extent it addressed Dr. Osborne's report, it only said whether the defendant was unable to obey the law, not whether he knew and understood the criminal — Holmes' criminality. Well, if this mattered, you had an opportunity for a hearing on ineffective assistance of counsel. Do you have any idea what evidence you would present? That was one of the points I was going to bring up. Your Honor, I do not. I don't — I mentioned that the investigator is available, that family members are available, that all these people are available. I don't know, without sitting down with them and putting together — really, this is a trial. It's a small trial. It's a hearing. Why didn't you submit their declarations before the district court? Well, first, Penholster would have said those should have been submitted in state court. But the critical question is whether or not the petition states a prima facie claim. And here, the petition, the petition alleges that there was ineffective assistance of counsel because trial counsel failed to investigate a mental defense, and then it explained on a one-page form that said briefly, explain your facts, and you could have one extra page about the mental — the birth damage. I've spent a lot of time on this, but I just want to ask you one question. Sure. I want to hear your response, too, because I find it persuasive. If an expert had testified to Gugliotta's mental competency, would the evidence of the prior conviction have come in, as well as other negative facts about Gugliotta? I think, actually, that that's unclear. First of all, the only prior conviction that we referenced was — That's a pretty bad one, terrorism. Well, if you go — it says terrorist threats by Hearns. If one looks at the facts of that case, it's once again Gugliotta being manipulated by Hearns to — and I don't know exactly what Hearns was doing. There was, again, no active involvement by Gugliotta. Again, that would be consistent. Now, it's not good behavior on his part, but the only other — only thing that that I don't think it's clear that it would. And it's not — because, in part, it would depend on what did the witness testify to, what did the expert witness testify to, and what — Well, if it was Dr. Osborne, he would have declared that Gugliotta told him he had not committed a prior crime. And Gugliotta also said, as counsel pointed out, that he'd never smoked crack cocaine, which was fundamentally inconsistent with everything in this case. And what does — what would a — I think I would anticipate that a smart psychologist would say, those are typical childhood reactions. That's what a 4-year-old would say to kind of avoid getting out of trouble. These are the — these are the responses of a mentally retarded individual. So I don't — I have a question, Brad, for this. Okay. I don't know what evidence that would be presented at the hearing. I do know that there are a number of witnesses that would be available that counsel would be — would have the opportunity to choose from. Okay. Well, I think we've heard it all now. Yeah. I would just note that the actual — We should submit this case. Okay. I think we've heard enough. Thank you. Thank you, Your Honor. All right. This matter is submitted.
judges: Pregerson, Noonan, Wardlaw